**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. _____ |
| Plaintiff, | **COUNT ONE:** |
| | **Conspiracy to Commit Wire Fraud** |
| v. | 18 U.S.C. §§ 1343 & 1349 |
| | NMT 20 Years Imprisonment |
| **SURESH MITTA,** | NMT 3 Years Supervised Release |
| a/k/a "Suresh Reddy", | NMT $250,000 Fine or Twice the Gross Gain |
| a/k/a "Mitta Suresh", | Fine |
| [DOB: 08/12/1967] | Class C Felony |
| Defendant. | **FORFEITURE ALLEGATION:** |
| | 18 U.S.C. § 981(a)(1)(C) and |
| | 28 U.S.C. § 2461(c) |
| | Criminal Forfeiture |

<u>**INDICTMENT**</u>

**THE GRAND JURY CHARGES THAT:**

<u>**GENERAL ALLEGATIONS**</u>

At all times relevant to this Indictment:

<u>Introduction</u>

1.      Between August 25, 2008, and continuing thereafter to February 19, 2015, in the

Western District of Missouri and elsewhere, the defendant, SURESH MITTA, a.k.a. "Suresh

Reddy", a.k.a. "Mitta Suresh", knowingly and intentionally conspired and schemed with Albert

Davis, David Tayce, Dave Hernon, Richard Bryant, Christina Bryant and others to fraudulently

obtain investments, conduct business transactions, and manipulate federal and state court

proceedings, by impersonating Cerner Corporation employees, and representing

communications, documents, price quotes, agreements, invoices, and bank accounts as if they

had legitimately originated from Cerner Corporation when, in fact, they were falsely and fraudulently created.

2.      As part of the scheme to defraud, the co-conspirators created dozens of companies which were designed to impersonate existing credible industry leaders.  For each company, the co-conspirators created a meticulous infrastructure that became the foundation for their fraud. The co-conspirators used this infrastructure to make the companies appear legitimate and succeeded by convincing others not to question the authenticity of communications and other documents they received.  The co-conspirators created infrastructures which included:

        a.      creating a company with a name which was chosen to be similar to other existing companies or leaders in the field, in order to impersonate those companies;

        b.      registering a domain similar to other existing company domains, in order to make email accounts appear legitimate;

        c.      leasing virtual office space in the city of the existing company, in order to obtain a physical address to use to receive mail and use on company paperwork, such as invoices and purchase orders;

        d.      establishing phone numbers in the area code of the existing company, in order to convince others they were calling employees in the appropriate city, when they were not;

        e.      opening bank accounts for their company using this information, in order to receive payments, which were promptly transferred to other accounts under their control.

3.      The co-conspirators used this fraudulent infrastructure of fraud to create fictitious "employees" to use with their companies.  Many of these "employees" were made to

impersonate actual people who worked for the real companies, several of whom the co-conspirators had actually met. For each fake "employee", the co-conspirators would use the detailed company infrastructure to make that fake "employee" appear real, which included creating an email address at their customized domain, assigning a phone number with the appropriate area code, and using a virtual address in the proper city.

4.     The co-conspirators then used these fake "employee" identities to communicate with investors, conduct business transactions, and manipulate court proceedings. The co-conspirators used the fraudulent communications to provide fabricated documents, agreements, quotes, and invoices. The co-conspirators used these fraudulent communications to exploit trust in business relationships, including the trust of their own attorneys. To minimize the risk of their fraudulent scheme being detected, the co-conspirators manipulated others into using email or phone conferences, rather than face-to-face meetings. The co-conspirators created long sequences of purported email conversations, to create the appearance of an email string between multiple people. Additionally, they played the part of created identities on the phone, and read from prepared notes and scripts to mislead others.

5.     One of the companies that the co-conspirators impersonated was Cerner Corporation, which is a global supplier of health care information technology solutions, services, devices, and hardware. Cerner Corporation has more than 14,000 employees globally, and is headquartered at 2800 Rockcreek Parkway, North Kansas City, Missouri 64117, which is within the Western District of Missouri. The co-conspirators built an infrastructure to impersonate Cerner Corporation, which included:

      a.     Creating a business entity Cerner, LLC;

      b.     Opening a bank account in the name of Cerner, LLC;

c.      Leasing a virtual office in Kansas City, Missouri, in the name of Cerner, LLC;

d.      Registering the domain cernerinc.com;

e.      Establishing several phone numbers in the Kansas City, Missouri 816 area code;

f.      Creating fictitious Cerner Corporation employees "Mike Callahan," "Mike Johnson," "Christina Draper," and "Suresh Mitta," each with cernerinc.com email addresses, 816 area code phone numbers, and Kansas City, Missouri physical addresses;

g.      Impersonating real Cerner Corporation employees "B.G." and "B.W.", by using fabricated email accounts with cernerinc.com email addresses, phone numbers in the 816 area code, and physical addresses in Kansas City, Missouri; and

h.      Creating communications from these fictitious identities, which contained documents, price quotes, agreements, invoices, and bank account information, all of which purported to be from Cerner Corporation.

6.      As a part of the scheme to defraud, the co-conspirators impersonated Cerner Corporation to obtain investments, conduct business transactions, and manipulate court proceedings, from which they obtained money and property, which included:

a.      The co-conspirators used this fraudulent infrastructure to manipulate the filing and settlement of the involuntary bankruptcy of CMI Holding Company, Inc. in Case No. 10-38011-SGJ-7, in the Northern District of Texas. The conspirators impersonated bondholders in filing the bankruptcy, and then continued to impersonate them throughout the negotiation of the settlement of the bankruptcy. Incredibly, the co-conspirators also impersonated an investor, which enabled them to participate in

settlement discussions from the other side of the litigation as well. As part of this scheme, they used fabricated documents and communications purporting to be from Cerner Corporation to obtain a larger settlement. The conspirators also created an entity to receive the funds of the settlement in place of the bondholders, and later conspired to cover it up by providing false testimony during the litigation of the lawsuit *Alice George, et al., v. Albert Davis, et al.,* Case No. 3:13-CV-03058-PKH (W.D.Ark. filed May 22, 2013).

b.    The co-conspirators used this fraudulent infrastructure to impersonate Cerner Corporation in the fraudulent sale of a purported newly developed MRI system to Dallas Medical Center, and then conspired to cover it up by providing false testimony during the litigation of the lawsuit *iHeart Care DMC Holdings, LLC. v. Dallas Medical Center, LLC., et al.*, Case No. 13-09460, in Dallas County, Texas.

c.    The co-conspirators used this fraudulent infrastructure to manipulate the trial of *LBDS Holding Company, LLC v. ISOL Technology, Inc., et al.*, Case No. 6:11-CV-428-LED, in the Eastern District of Texas, Tyler Division, by providing false testimony during the trial about Cerner Corporation, and causing the admission of fabricated evidence purporting to be documents and agreements with Cerner Corporation in the trial.

d.    The co-conspirators used this fraudulent infrastructure to misrepresent Cerner Corporation's interest and involvement in their company to solicit millions of dollars in investments from physicians and other investors;

7.    The co-conspirators used this elaborate infrastructure of business entities, website domains, phone numbers, addresses, bank accounts, and identities as a shield to prevent others

from detecting their fraud, all while the co-conspirators continued to use this scheme repeatedly over several years to mislead new investors, new business partners and new courts. This scheme included the conspirators doing the following:

     a.     Creating over 70 individual business entities, and during the relevant time periods discussed in this Indictment the co-conspirators either worked for one of these entities or impersonated individuals working for these entities, some of which included:

> Ansel Capital Partners, LLC
> Balboa Financing, Inc.
> Cardiom, LLC, Cerner, LLC
> CIS Cardiovascular, LLC
> Cohiba Holdings, LLC
> Eureka Group, LLC
> iHeart LLC
> KDL Medical, Inc.
> LBDS Holding Company, LLC
> Lux Imaging Systems, LLC
> Medlink Development, LLC
> Mentis, LLC
> Phi Health, Inc.
> Sawtooth Investment Group, LLC
> Vannevar Group, LLC

     b.     Registering dozens of website domains related to their business entities, which were used by the co-conspirators to create numerous customized email accounts and communicate as different identities, some of which included identities using the following domains:

> aghasri.com
> anselcapitalpartners.com
> arkansasfv.com
> balboacapitalinc.com
> bentonvilleweb.org
> ciscardiovascular.com
> ciscathlab.com
> cernerinc.com
> cohibaholdingsllc.com
> eurekagroupllc.com

genesismriservice.com
iheartcenters.com
iheartimaging.com
isoltechnology.net
lbdsmri.com
luximagingsystems.com
medlinkdevelopment.com
myfayetteville.net
osumedcenter.org
phihealth.com
sawtoothinvestmentgroup.com
springdalenet.com
texashealthcarellc.org
tupeloonline.net
vannevargroup.com.

  c.  Opening over 50 individual business bank accounts for their entities, which were located at Frost National Bank, JP Morgan Chase Bank, Bank of America, Wells Fargo Bank, Comerica Bank, Community Trust Bank, and Compass Bank, which enabled them to quickly transfer and conceal the proceeds from their fraud.

Background

  8.  On or about August 4, 1995, Albert Davis and his co-conspirators incorporated CMI Holding Company, Inc., ("CMI") in the state of Texas, and subsequently created a subsidiary entity Phi Health LP. Davis solicited investments in this company. Davis and his co-conspirators obtained investments from B.G., R.S., L.S., C.C., and G.C. (hereafter the "bondholders").

  9.  In June of 2003, Davis and his co-conspirators also obtained large investments from several venture capital companies, including Capital Southwest Corporation and First Capital Group of Texas (hereafter the "VCs").

  10.  By 2008, the VCs had invested a large amount of capital with Davis and his co-conspirators and were reluctant to invest further. As detailed in this Indictment and as a part of

7

this scheme, the co-conspirators then created a fictitious entity, Ansel Capital Partners, to pose as a new interested investor, and soon thereafter, the entity Cerner, LLC, to trade on Cerner Corporation's reputation and credibility to gain further investments. From that point, the co-conspirators repeated their scheme time and again to obtain further investments, and manipulate business transactions and court proceedings to accomplish the goals of the conspiracy.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)
### 18 U.S.C. §§ 1343 & 1349

11.     The factual allegations in paragraphs 1 through 10 of this Indictment are incorporated by reference as if fully set forth herein.

### The Conspiracy and Its Objects

12.     From at least on or about April 25, 2008, and continuing thereafter to on or about February 19, 2015, within the Western District of Missouri and elsewhere, the defendant, SURESH MITTA, a.k.a. "Suresh Reddy", a.k.a. "Mitta Suresh", knowingly and intentionally combined, conspired and agreed with Albert Davis, David Tayce, Dave Hernon, Richard Bryant, Christina Bryant and other persons known and unknown, to commit offenses against the United States, that is having devised and intended to devise a scheme for obtaining money and property by means of materially false and fraudulent representations that he and his co-conspirators were working with Cerner Corporation, by impersonating employees from Cerner Corporation, and by representing communications, documents, price quotes, agreements, invoices, and bank accounts as being related to Cerner Corporation, and for the purpose of executing such scheme and artifice, did knowingly cause and attempt to cause to be transmitted by means of wire communication in interstate commerce, writings, signs, and signals in the form

of payments via bank wire transfers, all contrary to the provisions of Title 18, United States Code, Sections 1343 and 1349.

## **Manner and Means**

13.     Members of the conspiracy, both known and unknown, used various manners and means to effect the objects and purposes of the conspiracy, to wit, including but not limited to:

a.     Registered website domains similar to other existing companies, including registering cernerinc.com, and created related email accounts from those domains;

b.     Created business entities similar to other existing companies, including creating Cerner, LLC;

c.     Leased virtual office space for their created entities in locations similar to the physical location of the other existing companies, including a virtual office for Cerner, LLC located at 2300 Main Street, 9th Floor, Kansas City, Missouri 64108;

d.     Opened bank accounts for their created entities in the names similar to other existing companies, including a JP Morgan Bank Account in the name of Cerner, LLC;

e.     Established phone numbers with local area codes for their created entities in the region similar to the other existing companies, including establishing at least seven (816) area code phone numbers for Kansas City, Missouri;

f.     Used these created entities to impersonate real employees from the other existing companies in person and in communications, including impersonating real Cerner Corporation employees;

g.     Created fictitious employees within their created entities to be used to communicate with others, including creating fictitious Cerner Corporation employees;

h.      Created email accounts in names similar to real doctors to use in communications impersonating those doctors;

i.      Created email accounts and fake identities to use as investors in communications, including using "Michael Dreco", "David Boone" and "Grace Larsen" from anselcapitalpartners.com;

j.      Created fake quotations, fake agreements, and fake invoices in the names of other existing companies and communicated them to others as authentic, including creating fake Cerner Corporation documents, communications, quotes, agreements, and invoices;

k.      Created over 50 bank accounts and transferred money between these accounts to hide the location and origin of the money;

l.      Produced false documents in federal and state civil lawsuits, including producing fake Cerner Corporation quotes, agreements, invoices and communications; and

m.      Testified falsely in federal and state civil lawsuits, including testifying falsely about partnerships and business dealings with Cerner Corporation and communications with Cerner Corporation employees.

## Overt Acts

14.      In furtherance of the conspiracy and to effect the objects thereof, MITTA and his co-conspirators, committed and caused to be committed the following overt acts, among others, in the Western District of Missouri and elsewhere:

15.      On or about April 25, 2008, registered the domain anselcapitalpartners.com, and thereafter created the identities "Michael Dreco" with the email address

10

mdreco@anselcapitalpartners.com, "Grace Larsen" with the email address glarsen@anselcapitalpartners.com, and "David Boone" with the email address dboone@anselcapitalpartners.com.

16.      On or about June 3, 2008, created Ansel Capital Partners, LLC in Colorado.

17.      On or about September 4, 2008, established the Sprint phone number "720-838-8436" account to use for the fictitious identity of Ansel Capital Partners, LLC employee "Michael Dreco" and "Grace Larsen".

18.      On or about November 17, 2008, created Sawtooth Investment Group, LLC, in the state of Wyoming, and created an address to use for the new company of 1740 H Dell Range Blvd, PMB 229, Cheyenne, WY 82009.

19.      On or about December 3, 2008, impersonated "Michael Dreco" on the phone and in email correspondence with VCs, and represented Ansel Capital Partners and Sawtooth Investment Group as outside investors unrelated to CMI, when in fact they both were Davis and his co-conspirator created and controlled entities.

20.      On or about May 1, 2009, registered the domain cernerinc.com, and thereafter created email accounts with the cernerinc.com domain to impersonate real Cerner Corporation employees "B.G." and "B.W.", and also created fake identities to use as Cerner Corporation employees in the name of "Mike Callahan" with the email address mcallahan@cernerinc.com, "Mike Johnson" with the email address mjohnson@cernerinc.com, "Christina Draper" with the email address christina.draper@cernerinc.com, and "Suresh Mitta" with the email address suresh.mitta@cernerinc.com.

21.      On or about May 22, 2009, sent an email to a physician, which falsely represented Cerner Corporation in a business deal by purporting to be from B.G., a real Cerner Corporation

employee, but the email was actually from the fake email account for B.G. at the cernerinc.com domain, and the email contained an attachment which was misrepresented to be from Cerner Corporation.

22.     On or about July 15, 2009, discussed via email amongst conspirators how to use a sequence of communications, including email communications from entities they created, to "regain leverage" and "apply pressure" on an employee from ISOL Technology, Inc. they were negotiating with.

23.     On or about July 17, 2009, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

24.     On or about July 18, 2009, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

25.     On or about July 21, 2009, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

26.     On or about July 22, 2009, formed the entity Eureka Group, LLC, in the state of Arkansas, in the name of "L. Carr", with the listed address of 1591 North Oakhaven Place, Fayetteville, Arkansas 72704, which was later determined to be the address of a relative of Davis.

27.     On or about August 8, 2009, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

28.     On or about October 4, 2009, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

29.     On or about October 30, 2009, created and sent a fake email from "Michael Dreco", with Ansel Capital Partners, which contained "Michael Dreco's" excitement about

Davis' partnership with Cerner Corporation, and stated that Ansel Capital Partners would commit to an additional $500,000 investment in CMI, but that the investment was contingent on CMI matching Ansel Capital Partners' investment with other sources. This email was used by Davis and his co-conspirators to solicit further investment from the VCs.

30.     On or about November 4, 2009, forwarded an email to the VCs, and the email purported to be from B.G. from Cerner Corporation, and it was not. The email was actually from the fake email account for B.G. using the cernerinc.com domain. The email read, "Bert, Thanks for the call yesterday. To follow-up from our discussion, Cerner is interested in participating in your current financing round. Please forward your term sheet and related investment documents for review with our team."

31.     In or about December, 2009, made misrepresentations via email and over the phone to VCs, which included statements about "Michael Dreco" and the involvement of Ansel Capital Partners; Cerner Corporation and its involvement and interest; as well as impersonating references for CMI, by pretending to be doctors from the North Mississippi Medical Center in Tupelo, Mississippi, and Allegheny Hospital in Pittsburgh, Pennsylvania; all in order to obtain further investments from the VCs.

32.     On or about January 5, 2010, forwarded an email to investors which purported to contain an email from B.G., a real Cerner Corporation employee, but the email was actually from the fake email account for B.G. using the cernerinc.com domain.

33.     On or about February 9, 2010, registered the domain eurekagroupllc.com, and thereafter created an associated email account lcarr@eurekagroupllc.com.

34.     On or about February 9, 2010, opened a bank account in the name of Eureka Group, LLC at Arvest Bank.

35.     On or about March 3, 2010, emailed an employee at ISOL Technology, Inc., falsely representing to be B.G., a real Cerner Corporation employee, but the email was actually from the fake email account for B.G. using the cernerinc.com domain.

36.     On or about April 12, 2010, registered the domain sawtoothinvestmentgroup.com, and thereafter created the identity "Beth Franks" with the email account bfranks@sawtoothinvestmentgroup.com.

37.     On or about May 4, 2010, forwarded an email, which purported to contain a purchase order from J.F. with Cardiovascular Institute of the South, and it was not authentic. The email read "FYI-CIS PO received".  This email was forwarded to misrepresent the sale of an MRI.

38.     On or about May 6, 2010, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

39.     On or about June 15, 2010, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

40.     On or about June 24, 2010, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

41.     On or about July 5, 2010, forwarded an email from "Michael Dreco" at Ansel Capital Partners amongst other conspirators asking for a review of the "sequence" before sending it to an employee from ISOL Technology, Inc.

42.     On or about July 16, 2010, forwarded an email from "Michael Dreco" at Ansel Capital Partners to an employee from ISOL Technology, Inc.

43.     On or about July 30, 2010, registered the domain tupeloonline.net.

44.     In or about August, 2010, sent a sequence of emails as "Michael Dreco" from Ansel Capital Partners, to the VCs requesting additional financing for CMI.

45.     On or about August 10, 2010, registered the domain americanradiologyus.com, and thereafter created email accounts with the americanradiologyus.com domain to impersonate real persons M.T. and K.W. from CML Healthcare.

46.     On or about August 10, 2010, registered the domain osumedcenter.org, and thereafter created an email account with the osumedcenter.org domain to impersonate real doctor O.S. from Ohio State University.

47.     On or about August 10, 2010, created and forwarded an email which purported to contain emails from B.W. at Cerner Corporation and M.T. and K.W. at CML Healthcare, which did not. The email actually contained emails from the domains cernerinc.com and americanradiologyus.com, both of which were created and controlled by Davis and his co-conspirators, and the email string was designed to misrepresent the commitments and interest of the impersonated individuals in the technology being developed by Davis and his co-conspirators.

48.     On or about August 11, 2010, created and forwarded an email which purported to be from O.S. at Ohio State University, which was not. The email actually contained an email from the osumedcenter.org domain, created and controlled by Davis and his co-conspirators, and the email was designed to misrepresent the commitments and interest of the impersonated individual in the technology being developed by Davis and his co-conspirators.

49.     On or about August 18, 2010, created two documents which were titled "Consent to Assignment – Cerner Corp Agreement.doc" and "Cerner Agreement.pdf", which were fabricated documents made to appear as authentic Cerner Corporation documents.

50.     On or about August 18, 2010, created and forwarded a string of emails purporting to be an email exchange between "Michael Dreco" from Ansel Capital Partners and Davis and co-conspirators, to the VCs.  The email string contained four attachments:  "Consent to Assignment - Cerner Corp Agreement.doc"; "Consent to Assignment - ASRI Agreement.doc"; "Cerner Agreement.pdf"; "Allegheny Agreement.pdf", and the email string purported to be the conspirators providing "Michael Dreco" and the VCs copies of real Cerner Corporation agreements evidencing approval and agreement with the conspirators plans, which were not authentic.

51.     On or about October 8, 2010, created a Gmail account in the name of bondholder R.S., to use to impersonate R.S. in communications.

52.     On or about October 21, 2010, emailed the VCs, copying "Michael Dreco" from Ansel Capital Partners, and made misrepresentations of business deals with American Radiology Services and Summit Medical Center in Oklahoma.

53.     In or about November of 2010, impersonated bondholders in a phone conference and email communications to attorney J.F., in order to hire J.F. to represent them and file a fraudulent involuntary bankruptcy on CMI, all in order to block the VCs from a planned friendly foreclosure of CMI.

54.     On or about November 10, 2010, sent emails to J.F. impersonating bondholder R.S. from a fake Gmail account, which contained a document purporting to be a "Power of Attorney" for R.S. to act on behalf of the bondholders, and directed J.F. to use Eureka Group, LLC for billing.

55.     On or about November 12, 2010, directed and caused the fraudulent filing of an involuntary bankruptcy petition against CMI Holding Company, Inc. in Case No. 10-38011-SGJ-7, which was filed in the Northern District of Texas.

56.     Between on or about November 12, 2010 and on or about January 31, 2011, emailed and communicated by phone as "David Boone", "Grace Larsen" and "Michael Dreco" of Ansel Capital Partners with the VCs, as they participated in the litigation involving the settlement of the involuntary bankruptcy petition against CMI Holding Company, Inc.

57.     Between on or about November 13, 2010, and January 31, 2011, communicated via email and phone calls with J.F., purporting to be bondholder R.S., and in these communications misrepresented CMI and its agreements with Cerner Corporation.

58.     On or about November 16, 2010, sent an email purporting to be from bondholder R.S. to J.F. which read in part, "As we discussed, it is critical to play our cards at the time that generates the most leverage."  The email contains a description which reads, "The sales distribution agreement with Cerner, Inc. is at the Phi Health LP entity.  A copy of the agreement and assignment consent for foreclosure transaction is attached.  See section 5 and 14.3 re: termination and assignment."  The email contained an attachment "Cerner agreement.pdf" and "Cerner agr assignment for foreclosure.pdf" which were fabricated documents purporting to be from Cerner Corporation, which were not.

59.     On or about November 17, 2010, participated in a phone settlement conference and impersonated bondholders during the call.

60.     On or about November 18, 2010, sent an email as "David Boone" from Ansel Capital Partners, which expressed concern with the bondholder's proposal.

61.     On or about November 19, 2010, registered the domain arkansasfv.com, and created an email address at this domain to use to impersonate bondholder L.S. in communications.

62.     On or about November 19, 2010, registered the domain bentonvilleweb.org, and created an email address at this domain to use to impersonate bondholder C.C. in communications.

63.     On or about November 19, 2010, registered the domain myfayetteville.net, and created an email address at this domain to use to impersonate bondholder B.G. in communications.

64.     On or about November 19, 2010, registered the domain springdalenet.com, and created an email address at this domain to use to impersonate bondholder G.C. in communications.

65.     In or about November, 2010, impersonated bondholder R.S. in a phone call to one of the VCs, and as R.S. declined offers to settle the lawsuit and stated that he would "kick [the VC's] ass" if he ever came to Arkansas.

66.     In or about December, 2010, made false representations to VCs about expenses to obtain additional "emergency" funds during the litigation.

67.     On or about December 3, 2010, sent an email as "Michael Dreco" from Ansel Capital Partners, to the VCs, which identified a fictitious identity of "Grace Larsen" to be the primary contact for Ansel Capital Partners during the litigation, using the email account glarsen@anselcapitalpartners.com and the phone number (720) 838-8436, which was an email account and phone number created and controlled by Davis and his co-conspirators.

68.     On or about December 7, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., which contained purported contact information for bondholder B.G. and used the email account at the domain myfayetteville.net and the physical address of 1591 North Oakhaven Place, Fayetteville, Arkansas 72704, which was later determined to be the address of a relative of Davis.  The email also contained the statement, "Use the following email addresses for the group" and contained the purported email addresses for the other bondholders L.S., using the domain arkansasfv.com, C.C., using the domain bentonvilleweb.org, and G.C., using the domain springdalenet.com, all domains which were created and controlled by Davis and his co-conspirators.

69.     On or about December 8, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., and stated "We have considered the request for a face-to-face meeting, believe that such a meeting is not necessary", and communicated several false statements and excuses designed to prevent any in-person meetings with J.F., or other parties involved in the litigation.

70.     On or about December 9, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., and copied the fake email accounts for bondholders B.G., L.S., C.C., and G.C., and declined a settlement offer by VCs.

71.     On or about December 15, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., assuring J.F. that any settlement money will flow through Eureka Capital, LLC to the group of bondholders.

72.     On or about December 20, 2010, opened a bank account in the name of Mentis LLC d/b/a Genesis Imaging at JP Morgan Chase.

73.     On or about December 21, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., stating that he "will be forwarding address change requests as most of the group is traveling over the holiday period."

74.     On or about December 23, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., which contained a purported forwarded email from bondholder G.C. using the fake email at the domain springdalenet.com, and requested the physical address for communications be changed to 1591 North Oakhaven Place, Fayetteville, AR 72704.

75.     On or about December 23, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., which contained a purported forwarded email from bondholder C.C., using the fake email at the domain bentonvilleweb.org, and requested the address for communications be changed to 1591 North Oakhaven Place, Fayetteville, AR 72704.

76.     On or about December 23, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., which contained a purported forwarded email from bondholder L.S, using the fake email at the domain arkansasfv.com, and requested the address for communications be changed to 1591 North Oakhaven Place, Fayetteville, AR 72704.

77.     On or about December 30, 2010, sent an email from the fake Gmail account for bondholder R.S. to J.F., which contained a proposed settlement agreement with purported signatures of all the bondholders, and contained the address of 1591 North Oakhaven Place, Fayetteville, AR 72704.

78.     Between on or about December 30, 2010, and January 7, 2011, used fraudulent communications acting as the bondholders described above on one side, and fraudulent communications acting as Ansel Capital Partners with VCs on the other side, and manipulated a confidential settlement agreement to be entered in the involuntary bankruptcy proceeding

regarding CMI Holding Company, Inc. in Case No. 10-38011-SGJ-7 in the Northern District of Texas, in which the VCs settled with the bondholders for $1,876,655.00.

79. On or about January 7, 2011, directed the proceeds of the settlement agreement to be paid to Eureka Group, LLC, and concealed that this entity was created and controlled by Davis and his co-conspirators.

80. On or about January 24, 2011, entered into a lease agreement with Regus for a virtual office for "Genesis Imaging" using the physical address of 70 West Madison Street, Three First National Plaza, Suite 1400, Chicago, Illinois 60602.

81. Between on or about January 28, 2011, and on or about December 1, 2011, initiated a sequence of wire transfers and other payments which were made from the Eureka Group, LLC to co-conspirators and their entities from these funds, which were not a part of the settlement agreement, and which totaled over $1.4 million.

82. In or about January, 2011, as a part of the settlement agreement, created the entity Phi Health, Inc. to take the place of CMI and Phi Health LP, which was now owned by the VCs and Ansel Capital Partners, and thereafter succeeded in placing the fictitious identity of "Grace Larsen" of Ansel Capital Partners on the board of Phi Health, Inc.

83. On or about January 31, 2011, registered the domain genesismriservice.com.

84. On or about February 3, 2011, misrepresented to VCs that Genesis MRI Service performed $100,000 of repair work on an MRI system owned by Phi Health, Inc., and misrepresented that this caused them to have to cancel demonstrations of the MRI system with key Cerner Corporation prospects, and directed this money be paid by Phi Health, Inc. to the bank account for Mentis, LLC d/b/a Genesis Imaging, which was created and controlled by Davis and his co-conspirators.

85.     On or about February 25, 2011, forwarded an email to the VCs, which purported to be from physician D.B. from Summit Medical Center in Oklahoma, approving the purchase of an MRI System.

86.     On or about March 4, 2011, opened two bank accounts in the name of Mentis, LLC d/b/a Genesis Imaging at Frost NB.

87.     On or about March 21, 2011, registered the domain ciscardiovacular.com, and thereafter created email accounts with the ciscardiovascular.com domain to impersonate real Cardiovascular Institute of the South physicians "J.F." and "C.W."

88.     On or about March 21, 2011, created the entity CIS Cardiovascular, LLC, using an address in Lafayette, Louisiana.

89.     On or about March 21, 2011, communicated to VCs that CIS found out about the bankruptcy and "cancelled" their purchase of an MRI, and requested a refund of $600,000, which the VCs paid to CIS Cardiovascular, LLC, an entity created and controlled by Davis and his co-conspirators.

90.     Between on or about April 8, 2011, and on or about April 13, 2011, sent communications to VCs falsely representing that Ansel Capital Partners board approved a $1.2 million investment for Phi Health, Inc., but that Phi Health, Inc. needed additional funds to bridge the company to fund payroll, which the VCs paid.

91.     On or about April 14, 2011, represented in communications to VCs that partner ISOL Technology was "cancelling" their contract with Phi Health, Inc., and that ISOL was taking possession of an MRI unit to fill a customer order.

92.     On or about April 20, 2011, represented in communications to the VCs that "ISOL" took possession of the MRI unit from a "Genesis repair facility."

93. On or about April 27, 2011, represented in communications that critical employees were resigning from Phi Health, Inc., when those employees were actually moving their employment to another entity created and controlled by Davis and his co-conspirators.

94. On or about May 2, 2011, represented in communications to VCs that Ansel Capital Partners would no longer be investing money into Phi Health, Inc.

95. On or about May 11, 2011, created Ansel Capital Healthcare, LLC d/b/a Advanced Imaging of Tulsa, LLC.

96. On or about May 12, 2011, registered the domain isoltechnology.net.

97. On or about May 12, 2011, entered into a lease agreement with Regus for a virtual office for "Advanced Imaging" using the physical address of 7633 E. 63rd Place, Suite 300, Tulsa, Oklahoma 74133.

98. In or about May, 2011, represented in communications to VCs that debts were owed from Phi Health, Inc. to ASRI for $100,000 and Advanced Imaging of Tulsa for $350,000, which were paid by VCs, and those payments were made to entities created and controlled by Davis and his co-conspirators.

99. On or about May 27, 2011, created Cohiba Holdings, LLC.

100. On or about June 2, 2011, registered the domain cohibaholdingsllc.com.

101. On or about June 8, 2011, opened a bank account in the name of Cohiba Holdings, LLC d/b/a CIS Cardiovascular at JP Morgan Chase.

102. On or about June 15, 2011, emailed VCs using the "Grace Larsen" for Ansel Capital Partners.

103. On or about June 20, 2011, registered the domain garderelaw.com.

104. On or about June 24, 2011, registered the domain aghasri.org.

105.    On or about June 29, 2011, purchased Phi Health, Inc. from the VCs, by acting as Cohiba Holdings, LLC, and concealing that Cohiba Holdings, LLC was created and controlled by Davis and his co-conspirators.

106.    On or about July 18, 2011, forwarded an email to a physician at Summit Medical Center in Oklahoma, and the message contained a purported email from B.G. from Cerner Corporation checking on the status of a potential sale of an MRI to Summit Medical Center.  The email was actually from the fake email account for B.G. using the cernerinc.com domain.  The email also contained the phone number "816-759-9938", which was a Kansas City, Missouri area code phone number for B.G., which was not an authentic Cerner Corporation phone number.

107.    Between on or about February 1, 2012, to December 31, 2013, solicited investments from over 50 physicians totaling over $6 million, based upon false representations of commitments of other customers and investors, including Cerner Corporation, along with false financial statements and projections.

108.    Between on or about February 1, 2012, to December 31, 2013, solicited and obtained investments from physicians by showing altered and misrepresented MRI images, which had metadata removed and altered to make the images appear to have been created by an "iHeart" machine when they were not.

109.    Between on or about February 1, 2012, to December 31, 2013, solicited and obtained investments from physicians by showing demonstrations of a Lux Imaging Systems MRI, which was represented to be brand new technology manufactured by Lux Imaging Systems, but was actually an MRI system put together with used components, which Davis and

his co-conspirators disguised by removing and concealing its original labels, and concealing that Lux Imaging Systems was an entity created and controlled by Davis and his co-conspirators.

110.    On or about February 20, 2012, created and sent an email as the fictitious identity "Beth Franks" using the email address bfranks@sawtoothinvestmentgroup.com to "Michael Dreco" at mdreco@anselcapitalpartners.com, which was then passed on to others as an authentic email to obtain investments.

111.    On or about March 7, 2012, entered into a lease agreement with Regus for a virtual office for "Cerner LLC" using the physical address of 2300 Main Street, 9th Floor, Kansas City, Missouri.

112.    On or about March 7, 2012, entered into a lease agreement with Regus for a virtual office for "Ansel Capital Partners" using the physical address of 10955 Westmoor Drive, Suite 400, Westminster, Colorado 80021.

113.    On or about March 7, 2012, created the business entity "Cerner LLC," using the physical address 2300 Main Street, 9th Floor, Kansas City, Missouri 64108.

114.    On or about March 8, 2012, opened JP Morgan Chase account XXXXX-6352 in the name of "Cerner LLC," using the physical business address of 2300 Main Street, 9th Floor, Kansas City, Missouri 64108.

115.    On or about April 19, 2012, settled a lawsuit and signed as "Michael Dreco" for Ansel Capital Partners in a Settlement Agreement with Capital Southwest Corporation, in *Capital Southwest Corporation v. Ansel Capital Partners, LLC*, in the Dallas County, Texas, Case No. CC-11-06939-D.

116.    On or about July 13, 2012, established the Sprint phone number "816-645-2590" account to use for contact information for a conspirator impersonating B.W., a real Cerner Corporation employee.

117.    On or about July 27, 2012, established the Sprint phone number "337-780-6620" account to use for contact information for a conspirator purporting to be "Wayne Johnson" from CIS Cardiovascular.

118.    Between on or about July 27, 2012, and May 28, 2013, communicated with employees at DMC over the phone pretending to be "Wayne Johnson" from CIS Cardiovascular in order to sell DMC a cath lab.

119.    On or about August 2, 2012, registered the domain ciscathlab.com, and thereafter created an email account to use with the fake identity "Wayne Johnson", which used the email account wjohnson@ciscathlab.com.

120.    On or about August 7, 2012, opened a bank account in the name of Delta Processing Inc., d/b/a CIS Cardiovascular at Frost NB.

121.    On or about August 10, 2012, registered the domain balboacapitalinc.com, and thereafter created the fake identity "Christopher Darby" using the email address cdarby@balboacapitalinc.com.

122.    On or about August 10, 2012, established the Sprint phone number "949-929-9048" account to use for contact information for a conspirator purporting to be "Christopher Darby."

123.    On or about August 10, 2012, sent an email to DMC from the fictitious email account cdarby@balboacapitalinc.com, which purported to offer financing and credit options for DMC.

124.     On or about August 10, 2012, established the Sprint phone number "816-582-2949" account to use for contact information for a conspirator impersonating B.W., a real Cerner Corporation employee.

125.     Between on or about August 24, 2012, and October 9, 2012, created an "Invoices" for the sale of a cath lab to DMC, which falsely purported to be from CIS Cardiovascular and listed "Wayne Johnson" as the sales contact for CIS Cardiovascular, a physical address for CIS Cardiovascular at 210 Dorsett Avenue, Lafayette, Louisiana 70501, and communicated wiring instructions for payment on the invoices to a Frost NB account in the name of CIS Cardiovascular.

126.     On or about August 30, 2012, established the Sprint phone number "816-394-3510" account and phone number "816-392-6612" to use as a fax number, for contact information of fictitious Cerner Corporation employee "Suresh Mitta."

127.     On or about October 8, 2012, registered the domain texashealthllc.org, and thereafter created an email account at the texashealthllc.org domain to use in communications to impersonate real physician T.D.

128.     On or about October 8, 2012, sent an email to DMC, which forwarded an email from the fake physician account for T.D. using the domain texashealthllc.org, which was falsely represented to be from a real doctor expressing interest in DMC obtaining a cath lab upgrade.

129.     On or about October 16, 2012, created a Gmail account in the name of physician J.F., to use to impersonate J.F. in communications.

130.     On or about October 16, 2012, created two "Quotes" for the sale of an MRI to DMC, which falsely purported to be from Cerner Corporation and listed "Mike Callahan" as the sales contact for Cerner Corporation.

131.    On or about October 16, 2012, sent an email to DMC, which falsely represented Cerner Corporation in negotiations by containing two "Updated Quotations" for the sale of an MRI to DMC and used the email account mike.callahan@cernerinc.com.

132.    On or about October 16, 2012, created and used "816-885-6902" and "816-571-5893" as contact information for fictitious Cerner Corporation employee "Mike Callahan."

133.    Between on or about October 16, 2012, and on or about June 21, 2013, impersonated "Mike Callahan" from Cerner Corporation on telephone calls with DMC.

134.    Between on or about October 16, 2012, and on or about June 21, 2013, impersonated real Cerner Corporation employee B.W. on telephone calls with DMC.

135.    On or about October 16, 2012, sent an email to DMC, which forwarded an email from the fake physician account for J.F., which was falsely represented to be from a real doctor expressing interest in DMC obtaining an MRI.

136.    On or about October 16, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a communication by forwarding an email purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

137.    On or about October 17, 2012, created a business card for "Senior Physicist Suresh Mitta of Cerner," with the Cerner Corporation logo, Cerner Corporation's Kansas City, Missouri headquarters address, and phone number in the (816) area code for Kansas City, all of which falsely represented to be for an employee of Cerner Corporation.

138.    On or about October 17, 2012, falsely represented Cerner Corporation in a meeting with employees from DMC and PHC, and introduced a conspirator as a Cerner

28

Corporation employee by misrepresenting him to be "Senior Physicist Suresh Mitta of Cerner" and providing a copy of a business card purporting to be from Cerner Corporation.

139.    On or about October 18, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a communication by using the account mike.callahan@cernerinc.com.

140.    On or about October 18, 2012, conducted a site visit at DMC and falsely represented being an employee of Cerner Corporation.

141.    On or about October 19, 2012, created a "Quote" for the sale of an MRI to DMC, which falsely purported to be from Cerner Corporation and listed "Mike Callahan" as the sales contact for Cerner Corporation.

142.    On or about October 19, 2012, sent an email to DMC, which falsely represented Cerner Corporation in negotiations by containing a "Revised Quotation" for the sale of an MRI to DMC and used the account mike.callahan@cernerinc.com.

143.    On or about October 22, 2012, sent an email to DMC, purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

144.    On or about October 25, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a communication by using the account mike.callahan@cernerinc.com.

145.    On or about October 26, 2012, sent an email to DMC, which forwarded an email from the fake physician account for T.D. using the domain texashealthllc.org, which was falsely represented to be from a real doctor expressing interest in DMC obtaining an MRI.

146.    On or about October 30, 2012, sent an email to DMC, purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

147.     On or about November 2, 2012, met with employees from DMC and represented to be from the company Medlink to install the MRI, and concealed that Medlink was a company created and controlled by Davis and his co-conspirators.

148.     On or about November 5, 2012, created a "Quote" for the sale of an MRI to DMC, which falsely purported to be from Cerner Corporation and listed "Mike Callahan" as the sales contact for Cerner Corporation.

149.     On or about November 5, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a financial transaction and negotiation by containing a "New Quotation" for the sale of an MRI to DMC and providing wiring instructions to a bank account in the name of Cerner with an address in Kansas City, Missouri, and by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

150.     On or about November 7, 2012, created an "Invoice" for the sale of an MRI to DMC, which falsely purported to be from Cerner Corporation and listed "Mike Callahan" as the sales contact for Cerner Corporation, a physical address for Cerner at 2400 Main Street, Kansas City, Missouri 64108, and wiring instructions for a JP Morgan bank account in the name of Cerner.

151.     On or about November 7, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a financial transaction by containing "Cerner Invoice 127892 to Dallase (*sic*) Med Ctr.pdf" for the sale of an MRI to DMC, and by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

152. On or about November 8, 2012, created a letter to DMC, which falsely purported to be from B.W., a real Cerner Corporation employee, and the letter contained a forged signature for B.W.

153. On or about November 8, 2012, sent an email to DMC, which falsely represented Cerner Corporation in communications by containing a "Letter re Value Dallas Med Ctr MRI 11-8-12.pdf" and by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

154. On or about November 13, 2012, met with an employee from DMC, and falsely provided names and phone numbers of doctors as references, which were not the doctors they were represented to be.

155. On or about November 13, 2012, impersonated doctors as "references" in telephone calls with DMC.

156. On or about November 16, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a communication by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

157. On or about December 4, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a communication by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

158. On or about December 11, 2012, created an "Invoice" for the sale of an MRI to DMC, which falsely purported to be from Cerner Corporation and listed "Mike Callahan" as the sales contact for Cerner Corporation, a physical address for Cerner at 2400 Main Street,

Kansas City, Missouri 64108, and wiring instructions for a JP Morgan bank account in the name of Cerner.

159.    On or about December 11, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a financial transaction by containing "Cerner Invoice 128243 to Dallas Med Ctr.pdf" for the sale of an MRI to DMC, and by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

160.    On or about December 17, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a communication by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

161.    On or about December 18, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a financial transaction by resending the "Cerner Invoice 128243 to Dallas Med Ctr.pdf" and using the account christina.draper@cernerinc.com.

162.    On or about December 28, 2012, sent an email to DMC, which falsely represented Cerner Corporation in a communication by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

163.    Between on or about February 13, 2013, and June 21, 2013, met with members of DMC and falsely represented to be from unrelated companies to install the MRI and train employees to use the MRI.

164.    On or about February 13, 2013, sent an email to DMC, which falsely represented Cerner Corporation in a financial transaction by resending "Cerner Invoice 128243 to Dallas

Med Ctr.pdf" for the sale of an MRI to DMC, and by purporting to be from B.W., a real Cerner Corporation employee, but the email was actually from the fake email account for B.W. using the cernerinc.com domain.

165.	On or about April 4, 2013, sent an email to doctors at Summit Medical Center in Oklahoma, which falsely represented Cerner Corporation in negotiations by containing a "Quote" for the sale of an MRI to Summit Medical Center and used the email account mjohnson@cernerinc.com.

166.	On or about July 18, 2013, met with employees from DMC and PHC and misrepresented the business relationship with Cerner Corporation.

167.	On or about July 24, 2013, attempted to impersonate an assistant to a physician in a communication to PHC.

168.	On or about September 27, 2013, provided false and misleading testimony under oath in a deposition in the civil lawsuit *iHeart Care DMC Holdings, LLC. v. Dallas Medical Center, LLC., et al.*, Cause No. 13-09460, in Dallas County, Texas.

169.	On or about January 28, 2014, provided false and misleading testimony under oath in a deposition in the in the civil lawsuit *iHeart Care DMC Holdings, LLC. v. Dallas Medical Center, LLC., et al.*, Cause No. 13-09460, in Dallas County, Texas.

170.	On or about January 31, 2014, provided false and misleading testimony under oath in a deposition in the in the civil lawsuit *iHeart Care DMC Holdings, LLC. v. Dallas Medical Center, LLC., et al.*, Cause No. 13-09460, in Dallas County, Texas.

171.	On or about February 27, 2014, produced a signed declaration in the civil lawsuit of *LBDS Holding Company, LLC v. ISOL Technology, Inc., et al.*, Case No. 6:11-CV-428-LED, in the Eastern District of Texas, Tyler Division, which contained false statements about a

"Distribution Agreement" with Cerner Corporation along with a copy of the "Distribution Agreement" which falsely represented to be signed by a real Cerner Corporation employee on behalf of Cerner Corporation.

172.     Between on or about March 5, 2014, and on or about March 6, 2014, testified falsely about communications with Cerner Corporation and business relationships with Cerner Corporation during the civil trial of *LBDS Holding Company, LLC v. ISOL Technology, Inc., et al.*, Case No. 6:11-CV-428-LED, in the Eastern District of Texas, Tyler Division.

173.     Between on or about March 5, 2014, and on or about March 6, 2014, caused exhibits to be admitted as evidence, which were emails using the cernerinc.com domain and were misrepresented to be authentic communications with employees from Cerner Corporation, during the civil trial of *LBDS Holding Company, LLC v. ISOL Technology, Inc., et al.*, Case No. 6:11-CV-428-LED, in the Eastern District of Texas, Tyler Division.

174.     Between on or about March 5, 2014, and on or about March 6, 2014, caused an exhibit to be admitted, which purported to be a "Distribution Agreement" and misrepresented it to be an authentic agreement with Cerner Corporation, during the civil trial of *LBDS Holding Company, LLC v. ISOL Technology, Inc., et al.*, Case No. 6:11-CV-428-LED, in the Eastern District of Texas, Tyler Division.

175.     On or about January 21, 2015, provided false and misleading testimony under oath in a deposition in the civil lawsuit *Alice George, et al., v. Albert Davis, et al.,* Case No. 3:13-CV-03058-PKH (W.D.Ark. filed May 22, 2013).

176.     On or about January 21, 2015, provided false and misleading testimony under oath in a deposition in the civil lawsuit *Alice George, et al., v. Albert Davis, et al.,* Case No. 3:13-CV-03058-PKH (W.D.Ark. filed May 22, 2013).

177.    On or about February 5, 2015, provided false and misleading testimony under oath in a deposition in the civil lawsuit *Alice George, et al., v. Albert Davis, et al.,* Case No. 3:13-CV-03058-PKH (W.D.Ark. filed May 22, 2013).

All in violation of Title 18, United States Code, Section 1349.

### FORFEITURE ALLEGATION
### (In violation of 18 U.S.C. §§ 1343 and 1349 - Wire Fraud)

178.    The allegations of Count One of this Indictment are alleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America of property, in which one or more of the defendants has an interest, pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

179.    Upon conviction of the offense listed in Count One, the defendant, SURESH MITTA, a.k.a. "Suresh Reddy", a.k.a. "Mitta Suresh", shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses alleged in Count One, all pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 1956(c)(7), and Title 28, United States Code, Section 2461(c).  The property to be forfeited includes, but is not limited to, a money judgment in the amount of any property, real or personal, which constitutes, or is derived from, proceeds traceable to the conspiracy to commit a violation of Title 18, United States Code, Sections 1343 and 1349, for which a defendant is convicted.

### Substitute Assets

180.    In the event that the property which is subject to forfeiture to the United States, as a result of an act or omission of the defendant:

        a.      Cannot be located upon exercise of due diligence;

b.      Has been placed beyond the jurisdiction of the Court;

c.      Has been transferred or sold to, or deposited with a third party;

d.      Has been substantially diminished in value; or,

e.      Has been commingled with other which cannot be divided without difficulty; it is the intent of the United States to seek forfeiture of any property of the defendant up to the value of such property, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and incorporating by reference Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p).

A TRUE BILL.


___/s/ Laurie A. Payne_____
FOREPERSON OF THE GRAND JURY


_/s/ Matthew P. Wolesky_____
MATTHEW P. WOLESKY
Assistant United States Attorney


Date:   ___11/16/16_____
       Kansas City, Missouri